## Commonwealth *vs.* Joseph W. Buckman.

Norfolk. March 11, 2011. - November 29, 2011.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Constitutional Law,* Public trial, Jury, Admissions and confessions, Assistance of counsel. *Jury and Jurors. Practice, Criminal,* Public trial, Jury and jurors, Argument by prosecutor, Assistance of counsel, New trial, Capital case. *Evidence,* Identification, Third-party culprit, Relevancy and materiality, Admissions and confessions, Expert opinion, Disclosure of evidence. *Deoxyribonucleic Acid. Due Process of Law,* Fair trial. *Words,* "Faint results."

A Superior Court judge correctly denied a criminal defendant's second motion for a new trial, in which the defendant alleged a violation of his constitutional right to a public trial under the Sixth Amendment to the United States Constitution, where the defendant failed to meet his burden of showing a general or partial closure of the court room during jury selection. [27-29]

There was no merit to an argument that the judge at a murder trial improperly precluded the defendant from presenting evidence of potential third-party culprits, where the evidence that the defendant offered either had no substantial probative value or tended to prejudice or confuse the jury, and where the defendant was able to adduce the evidence in presenting his defense based on the failure of police fully to investigate the crime. [29-32]

A criminal defendant failed to demonstrate that the prosecutor at his murder trial knowingly presented false or materially misleading evidence, either by offering evidence of the defendant's voluntary noncustodial statement [33-34] or by offering, to demonstrate the extent of the police investigation and in anticipation of cross-examination by the defendant regarding his third-party culprit theory, full and accurate testimony by the Commonwealth's expert regarding inconclusive scientific test results [34-35].

There was no merit to a criminal defendant's argument that the Commonwealth failed to make timely disclosure of certain expert materials, or that he was prejudiced by the Commonwealth's late disclosure of a State police crime laboratory chemist's notes. [35-37]

At a murder trial, the prosecutor's statement in closing argument that wounds on the defendant were caused by the victim was fair argument [37-38]; further, the prosecutor did not improperly appeal to the jurors' emotions [38]; finally, the prosecutor's argument regarding inconclusive deoxyribonucleic acid test results, although improper, likely did not influence the jury's verdict [38-39].

A criminal defendant failed to demonstrate ineffective assistance arising from his counsel's failure to move to suppress certain evidence taken from the defendant's person after the issuance of a search warrant [39-40] or to suppress photographs and a videotape recording of the defendant's residence (the crime scene) taken by police, without a warrant, to memorialize what

the officers properly saw in plain view [40-41], where such motions had no likelihood of success; further, no ineffective assistance arose from counsel's perfectly reasonable strategic decision not to call medical personnel who treated the defendant in order to offer cumulative evidence [41-43].

A Superior Court judge did not abuse her discretion in denying a criminal defendant a hearing on his motion for a new trial. [43]

INDICTMENT found and returned in the Superior Court Department on March 2, 1998.

The case was tried before *R. Malcolm Graham*, J.; motions for a new trial, filed on March 30, 2005, were considered by *Judith Fabricant*, J., and a supplemental motion for a new trial, filed on August 13, 2009, also was considered by her.

*John M. Thompson* for the defendant.

*Varsha Kukafka*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. He filed a notice of appeal on October 2, 1998, the day of the conviction, but appellate proceedings were stayed for several years pending the defendant's requests for further investigation. On March 30, 2005, the defendant filed a motion for a new trial that was augmented and expanded at various times in 2006 and 2007 before being denied without hearing on April 30, 2008. He then filed a supplemental motion for a new trial on August 13, 2009, that was denied without hearing on December 24, 2009. The defendant's appeal from the denial of these motions has been consolidated with his direct appeal. After oral argument, we remanded the case for further findings as to the public trial claims raised in the defendant's supplemental motion for a new trial. Findings and an order reaffirming the denial of the supplemental motion for a new trial were entered on June 10, 2011, and the parties have since submitted memoranda of law discussing the findings and order.

The defendant argues, among other things, that the conviction must be overturned because (1) closure of the court room during jury selection violated his constitutional right to a public trial under the Sixth Amendment to the United States Constitution; (2) the defendant improperly was precluded from presenting

evidence of potential third-party culprits; (3) one of the Commonwealth's deoxyribonucleic acid (DNA) experts offered improper testimony; (4) the Commonwealth failed to make timely disclosure of expert materials; (5) the prosecutor's closing argument was improper; and (6) trial counsel was ineffective. Further, the defendant argues that the motion judge erred in ruling on his motions for a new trial without holding an evidentiary hearing. We affirm the conviction, the orders denying the defendant's motion for a new trial and his supplemental motion for a new trial, and we decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues.

Shortly before 6 A.M. on December 19, 1997, John Loder entered the Randolph police station and reported that he had just found his boss bound and gagged on the garage floor at the boss's home. Officers were dispatched to the residence at 38 Birchwood Road where the defendant, Joseph Buckman, resided with his wife, Susan. The first officers arriving at the scene observed that one of the garage doors was open. On entering the garage, the officers found the defendant lying on the concrete floor with his arms around a lally column and his eyes, mouth, and wrists bound with duct tape. One officer felt for the defendant's pulse, which was fast and weak, while the other officers proceeded to search the home for victims and intruders. The officers found nothing.

Meanwhile, the dispatch officer drove to the scene with Loder in his cruiser. Emergency medical technicians from the Randolph fire department also responded to the scene and began treating the defendant. The officers conferred and reported that, aside from the defendant, there appeared to be neither additional victims nor intruders in the home. Loder advised that the defendant's wife should be at home and likely would be in the master bedroom. Officers conducted a second search at which point they discovered her body lying on the bed behind a rolled up comforter. The victim had been stabbed forty-one times and the violence of the attack was such that first responders initially concluded that the cause of death was a gunshot wound. Emergency medical technicians who had been tending to the defendant checked for a pulse or heartbeat, and quickly determined that the victim could not be resuscitated.

During the initial search the defendant had remained bound in the garage while the officers secured the home. When the ambulance and additional officers arrived, a police sergeant freed the defendant from his restraints by cutting the duct tape that bound his wrists. The sergeant noted that the tape was "on kind of loosely" and that it could be cut away without their having to touch the defendant's skin. The defendant appeared to be unconscious. After being freed, the defendant faded in and out of responsiveness, reported being unaware of how he came to be tied up in the garage and stated that "[he] was in a car accident." The defendant ultimately was transported by ambulance to a hospital where he provided police with various hypotheses about the morning's events, including that he may have been robbed of a substantial amount of cash. The defendant was informed by police of his wife's death and provided with Miranda warnings. While officers spoke with the defendant they noticed a number of scratches on his head, at least one of which ran from the base of the neck to the top of the head.

The defendant's clothing was later subjected to DNA analysis. Results of these tests matched bloodstains on both of the defendant's sleeves, shirttail, and blue jeans with the victim's DNA. Additionally, the defendant's fingerprints were found on one of the intermediate layers of the duct tape that bound his wrists, on the duct tape that covered his mouth, and on the "lead" (the few inches at the end) of a roll of duct tape found at the foot of the victim's bed. No other identifiable fingerprints were found on the roll or on the strips taken from the defendant's body. Chemical tests were also performed that suggested trace amounts of blood were present on both the palms and backs of the defendant's hands as well as on a steak knife found in the kitchen sink.

2. *Public trial claims.* The defendant asserted in his supplemental motion for a new trial that the court room was closed during jury selection, violating his right to a public trial. A Superior Court judge, who was not the trial judge (the trial judge had been appointed to the Appeals Court), denied the supplemental motion without hearing. After oral argument, we concluded that the record was insufficient for meaningful consideration of the defendant's claims and remanded the case for an evidentiary hearing. The motion judge held a hearing,

made thorough findings of fact, and reaffirmed her previous order denying the supplemental motion for a new trial. For the reasons set forth below, we conclude that the order denying that motion was correct.

The defendant asserts that, during the period when his case was tried, it was uniform practice for the public to be excluded from jury selection in the Norfolk Division of the Superior Court Department. In addition to identifying a standard operating procedure, the defendant also alleges that all spectators were in fact removed or excluded from the court room during jury selection in his trial, and that court officers enforced this closure by repeatedly reminding potential attendees that they were excluded. Finally, the defendant contends that exclusion of potential witnesses from the jury selection process, including members of his nuclear and extended family, violated his right to a public trial.

In support of these assertions, the defendant has produced documentary evidence including records from other proceedings in that court house as well as affidavits from himself, his attorney, and his daughter. On remand, the defendant's son and daughter testified that the court room was at least partially closed. The defendant's own testimony supported the facts recollected by his children. The Commonwealth presented opposing testimony from an assistant district attorney, prosecution witnesses who testified at the trial, and the court officers who assisted in administration of the trial.

The motion judge concluded that "[b]ased on the credible evidence . . . neither the court officers nor anyone else excluded the public generally from the courtroom during impanelment."[1]

"In claiming that his Sixth Amendment right to a public trial was violated, '[t]he burden is clearly on the defendant to demonstrate that the public was excluded from his trial.' " *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 107-108 (2010)

---

[1]The motion judge observed the witnesses and found that the credibility of the defendant's son and daughter was reduced by the lapse of time between testimony and trial and their strong bias in favor of their father. In addition, the judge considered that the daughter's familiarity with the facts of *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94 (2010) (*Cohen*), appears to have intruded on her recollection of her father's trial. These findings are supported in the record and, in any event, the motion judge is "the final arbiter of questions of credibility." *Commonwealth* v. *Walker*, 443 Mass. 213, 224 (2005).

(*Cohen*), quoting *Commonwealth* v. *Williams*, 379 Mass. 874, 875 (1980). The defendant's claim that the public generally was excluded from his trial is directly contradicted by the motion judge's finding that "neither the court officers nor anyone else excluded the public generally from the courtroom during impanelment." This finding is supported in the record and we accept it as true. See *Cohen*, *supra* at 105, quoting *Commonwealth* v. *Tucceri*, 412 Mass. 401, 409 (1992) ("As the defendant's 'new trial claim is constitutionally based, this court will exercise its own judgment on the ultimate factual as well as legal conclusions' "). We conclude that the defendant has failed to meet his burden of showing that a general closure of the court room occurred during jury selection.

The defendant also has alleged that individual members of the public, including his friends and family members, improperly were excluded from the court room during jury selection as a result of a witness sequestration order, and that this exclusion constitutes a partial closure of the court room. The motion judge found that "[t]he credible evidence *does not provide a basis to determine whether* the defendant's children [or any other of the defendant's family members] were present in the courtroom during impanelment or during the motion hearing that preceded impanelment" (emphasis added).[2] Based on these findings, we conclude that the defendant has failed to satisfy his burden to show there was a partial closure of the court room. The supplemental motion for a new trial properly was denied.

3. *Third-party culprit evidence.* Prior to trial, the Commonwealth moved to preclude the defendant from offering third-party culprit evidence. The defendant made an offer of proof regarding at least three potential third-party culprits: a serial killer released from prison in Georgia approximately two weeks before the murder in this case occurred; a neighbor of the Buckmans who had shot John Loder's dog while the dog was tied up

[2]The exclusion from the court room, pursuant to a sequestration order, of persons identified by the parties as witnesses is generally not considered to be a partial closure of the court room. See *United States* v. *Blanche*, 149 F.3d 763, 769-770 (8th Cir. 1998). Such exclusion, however, ordinarily would not include the exclusion of such witnesses from the jury empanelment portion of the trial proceedings. See Benchbook for U.S. District Court Judges at 87 (5th ed. 2007); Wigmore, Sequestration of Witnesses, 14 Harv. L. Rev. 475 (1901).

in the Buckman's front yard, sparking a lawsuit with John Loder; and Loder himself, who had made the initial report to police and who, after the police failed to locate the victim in their initial search, advised them that the defendant's wife was likely to be in the master bedroom.

After hearing the parties' arguments, the trial judge allowed the motion in limine based on what had been presented to that point. The judge did not order the exclusion of any evidence. Instead, he merely stated that if the defendant intended to pursue third-party culprit arguments and evidence, defense counsel should provide advance warning so that the judge would be prepared to make a proper ruling.

At the close of evidence at trial, the judge found that no evidence of a third-party culprit had been introduced, but that the defense could argue in closing that police had not fully investigated the possibility. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 486 (1980). The defendant asserts that his ability to present third-party culprit evidence was circumscribed by the judge's statements and rulings and that, as a result, he was deprived of various rights under the Massachusetts and Federal Constitutions.

The standard applicable to admission of third-party evidence in Massachusetts is well settled:

> "Third-party culprit evidence is 'a time honored method of defending against a criminal charge.' *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). 'A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it.' *Commonwealth* v. *Lawrence*, 404 Mass. 378, 387 (1989) . . . . We have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged. 'If the evidence is "of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." ' *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004) . . . . Yet, this latitude is not unbounded . . . because [a third-party culprit defense] inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires

the Commonwealth to prove beyond a reasonable doubt
that the third-party culprit did not commit the crime."

*Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 800-801
(2009). See *Commonwealth* v. *Ruell*, 459 Mass. 126, 130-135
(2011); *Commonwealth* v. *Conkey, supra* at 66-67. The defend-
ant has not met this standard.

The trial judge did not foreclose the possibility that the defend-
ant might be able to make a sufficient showing at trial for the
admission of third-party culprit evidence. He merely suggested
that there was insufficient information to make a definitive rul-
ing at that time, and clearly indicated that the door was still
open to the defendant.

The evidence that the defendant offered regarding the serial
killer was not "so closely connected in point of time and method
of operation as to cast doubt upon the identification of [the]
defendant as the person who committed the crime." *Com-
monwealth* v. *Hunter*, 426 Mass. 715, 716-717 (1998), quoting
*Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). Moreover,
the defendant could not place the serial killer in the vicinity at
the time of this murder. Admitting evidence that there was a se-
rial killer on the loose would have amounted to mere indirec-
tion and would have had no relevance to this case.

Similarly, the fact of tensions between the neighbor, the Buck-
mans, and Loder was not indicative of the neighbor's motive to
kill, and the defendant offered and produced no evidence sug-
gesting that the neighbor had any opportunity to kill beyond
that possessed by any neighbor. See *Commonwealth* v. *Silva-
Santiago, supra.* Accordingly, evidence intended to show that the
neighbor was a third-party culprit would have been inadmissible.

Finally, defense counsel opposed the Commonwealth's mo-
tion in limine based on the following evidence she expected to
introduce regarding Loder: (1) he had a key to the defendant's
house; (2) he found the defendant but did not remove the duct
tape; (3) he did not telephone a neighbor for help, but instead
drove to the police station; (4) he worked for the defendant,
knew of the defendant's "football card" gambling business, and
knew there could be money in the house that day; (5) Susan
Buckman was afraid of Loder, having at one point found him

on his hands and knees in the upstairs hall; and (6) when he returned to the house, he told police officers that Susan Buckman should be in the bedroom. Defense counsel also pointed out that the Commonwealth had failed to obtain any forensic evidence from Loder. The trial judge correctly noted at the close of the evidence that the defendant failed to offer evidence that tended to show a third person had killed his wife. Specifically as to Loder, there was no evidence that he had motive or intent to commit the crime. Third-party culprit evidence is offered for the truth of the matter, and as such it must have substantial probative value in connecting a third person to the crime. See *Commonwealth* v. *Silva-Santiago*, *supra*. The defendant failed to make the requisite showing. Evidence that the victim feared Loder because she once discovered him on his hands and knees in the upstairs hall is inadmissible hearsay, it does not tend to show that Loder killed the victim, and the evidence could have confused the jury. See *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588-589 (2000).

The defendant presented this same issue in his motion for a new trial. In denying that motion, the motion judge concluded that "all of the evidence that trial counsel proposed to offer [as to Loder], and virtually everything the defendant now suggests she should have offered, was in fact adduced through testimony of Loder and other witnesses."[3] The defendant thus was able to present the material he sought on this point. He also was able to make a forceful *Bowden* argument based on the failure of police fully to investigate Loder's potential involvement. See *Commonwealth* v. *Silva-Santiago*, *supra*. On the record of this trial, there was no violation of the defendant's right to present relevant evidence in his own defense. Although he was not permitted to argue specifically that a third-party culprit committed the crime for which he was charged, he was able to raise the issue through a *Bowden* defense, which, as a practical matter, was not so different from a third-party culprit defense here.

---

[3]The defendant argued in his motion for a new trial that evidence should have been offered that Loder used knives in the course of his work in the Buckman's garage, that he did not speak to the defendant's children at the house on the morning of the murder, that he did not attend the victim's funeral, and that he did not resume employment with the defendant's business after the murder. Our review of the record suggests that the motion judge was correct in concluding that these items have no apparent probative value.

4. *False or materially misleading evidence.* The defendant argues that the prosecutor knowingly presented false or materially misleading evidence. The evidence in question consisted of an interview Sergeant Joseph Flaherty of the State police had with the defendant in the hospital, and DNA evidence presented by Cellmark Diagnostics laboratory (Cellmark) analyst LeeAnn Hooper.

Flaherty told the jury that he asked the defendant if there was any duct tape in the house, and the defendant answered that he had used duct tape a few months earlier to repair a dryer hose in the laundry room. Flaherty also asked the defendant if there was any reason why his wife's blood would be on the duct tape or on his clothing. The defendant answered there was no reason. Although Flaherty had no information about the sources of the blood or fingerprints at the time, there appeared to be blood on the defendant's clothing, on the dryer, and on the floor near the washing machine. Subsequent analysis revealed that the victim's DNA was found in blood taken from the defendant's shirt and blue jeans, and his fingerprints were found on the duct tape used to bind his wrists and cover his mouth. However, the victim, but not the defendant, had been excluded as a source of DNA found on the duct tape, the dryer, and the floor near the washing machine.

The defendant posits that the possibility that his blood had been deposited innocently on the duct tape when he was repairing the dryer hose created a "serious obstacle to the prosecutor's desire to connect the blood on the tape to the murder [and] [t]hat obstacle was compounded by the DNA evidence that none of the blood on the tape was [the victim's]." To overcome this obstacle, the defendant continues, the prosecutor engaged Hooper, the Cellmark analyst, in the following exchange immediately after she testified that the victim had been excluded as a source of the DNA found on the duct tape:

> *Q.:* "Were there any other results that you obtained from this sample?"
>
> *A.:* "No, I did not."
>
> *Q.:* "No other results on this —"
>
> *A.:* "Oh, no, I'm sorry, I thought you meant conclusions.

"Well, in addition to the results that were obtained on the sample, there were faint results obtained. Those faint results are not interpreted due to the fact that they do not meet our threshold standard. So, if they are below the threshold, they are not interpreted, but we did obtain faint results."

*Q.:* "Do you have an opinion as to whether or not if those faint results were DNA from another person, then it would be possible for [the victim] to be the source of the DNA?"

*A.:* "They could be from another individual, and [the victim] could possibly be the source of those faint results."

*Q.:* "Do you have an opinion as to whether or not it was possible therefore that on this bloodstained area of the cutting of duct tape taken from [the defendant's] mouth, both his DNA and her DNA could be present?"

*A.:* "That is a possibility that [the victim] is present, yes."

There was no objection.

There is nothing improper in Sergeant Flaherty's questions to the defendant. He was merely posing questions based on incomplete information and assumptions which, based on his training and experience, were appropriate to help him decide whether the defendant may have been involved in the killing. However, even if Flaherty had deliberately lied to the defendant, which we do not imply, that alone would not render his noncustodial statement involuntary. See *Commonwealth* v. *Selby,* 420 Mass. 656, 664 (1995).

Generally, Hooper's "faint results" testimony would be inadmissible. See *Commonwealth* v. *Curnin,* 409 Mass. 218, 222 n.7 (1991) (where "the results of a DNA test may be inconclusive . . . the consequences of the test are inadmissible"); *Commonwealth* v. *Mattei,* 455 Mass. 840, 850 n.24 (2010) (same). However, where, as here, the defendant has called into question the integrity of the police investigation, the fact of, but not the details of, an inconclusive test result may be admitted to show the extent of the police investigation. See *Commonwealth* v.

*Mathews*, 450 Mass. 858, 872 (2008). The prosecutor elicited more than he was entitled to under the *Mathews* case. However, he properly could anticipate trial counsel's cross-examination that the DNA test results on the duct tape supported the defendant's third-party culprit theory.[4] As expected, trial counsel elicited testimony from Hooper on cross-examination to the effect that if there were DNA in the "faint results," Hooper could not determine whose DNA it was. There was no error in the admission of the "faint results" testimony.

Hooper's "faint results" testimony was not "false," as the defendant insists. This issue was presented in the defendant's motion for a new trial, and each side presented expert affidavits. The motion judge concluded, correctly, that Hooper made full and accurate disclosure in her trial testimony, and that a fair reading of that testimony indicated that some DNA was in fact detected, and the victim, but not the defendant, could be excluded as a source. In addition, "faint results" were obtained, but were below the Cellmark threshold for comparison and interpretation. It could not be determined whether the "faint results" were a technical artifact produced by the testing process itself or DNA from an unidentified person. If it were DNA from another person, it literally could be anybody's, even the victim's. There was no error.

5. *Failure to make timely disclosure of expert materials.* The defendant argues that the Commonwealth failed to disclose Dr. Robin Cotton's[5] opinion that the victim was not a source of DNA on either sample of the duct tape removed from the defendant, and thereby denied the defendant his right to due process of law. Dr. Cotton's opinion was first expressed in her affidavit dated February 26, 2008, offered in opposition to the motion for a new trial. The defendant's argument was raised in a very different form in his motion for a new trial, where he claimed Dr. Cotton's affidavit undercut Hooper's testimony. The motion judge's observations remain pertinent here: "The argument . . . reflects a misinterpretation of Dr. Cotton's affidavit . . . ." Dr.

---

[4]Trial counsel did not object and state she had no intention of exploring this area on cross-examination.

[5]Dr. Cotton was the director at Cellmark Diagnostics laboratory prior to and at the time of the defendant's trial.

Cotton stated that, as to the duct tape used to bind the defendant, if the "faint results" were from a single secondary contributor, rather than a technical artifact, they could not have come from the victim, because they include an allele she does not have; but if they came from more than one secondary contributor, then the victim could have been a source, because they also include an allele she does have. Dr. Cotton's opinion is entirely consistent with Hooper's trial testimony that the "faint results" "may be due to the presence of DNA from more than one individual or to technical artifacts," and that there "is a possibility that [the victim] is present" along with DNA of the defendant. The Commonwealth had no reason to solicit Dr. Cotton's opinion until 2008, and in any event it does not state what the defendant claims. In short, it offers him nothing.

The defendant also contends that the Commonwealth violated the discovery order by failing to disclose Hooper's "faint results" opinion. Hooper's testimony about "faint results" was no more than an explanation about the nature of such results; namely, it could not be determined if the results were an artifact or DNA from more than one individual, and the results are not interpreted because they fail to meet Cellmark's threshold standard. This information is contained in her report dated August 5, 1998, which had been provided to the defendant. As the judge who heard the motion for a new trial concluded, Hooper's testimony was not inconsistent with her report, which was provided to trial counsel. We agree.

The defendant next contends that he was prejudiced by the Commonwealth's late disclosure of a State police crime laboratory chemist's notes. The prosecutor provided the notes to trial counsel shortly before empanelment began. The prosecutor received them the day before, notwithstanding a much earlier request. Trial counsel declared that the materials were exculpatory and moved orally to dismiss, or, alternatively, for a continuance. The trial judge reviewed the notes and concluded counsel would have sufficient time to review them before testimony began. He denied both motions. The chemist testified on the second day of testimony. There has been no showing of bad faith, nor has there been a claim of bad faith.

"Absent a showing of bad faith, we consider the primary issue

of prejudice. In measuring prejudice, 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant "to make effective use of the evidence in preparing and presenting his case." ' " *Commonwealth* v. *Nolin*, 448 Mass. 207, 224 (2007), quoting *Commonwealth* v. *Stote*, 433 Mass. 19, 23 (2000).

The defendant claims the chemist's notes show that he swabbed the defendant's hands in the hospital before the search warrant issued for his person, and timely disclosure would have allowed him to establish at the suppression hearing that the evidence derived from the swabbing was unconstitutionally seized. The defendant concedes that the notes are ambiguous as to when this occurred, but he asserts that the chemist testified that this occurred at 10:10 A.M.

The chemist testified that the swabbing was done pursuant to the warrant and that he was not sure of the time, but he believed he arrived around 10 or 11 A.M. The chemist did not testify that it occurred at 10:10 A.M., as the defendant claims. The chemist's notes suggest that he may have been at the hospital at about 10:10 A.M., but they further indicate that the chemist did not become involved in performing tests on the defendant until 2:45 P.M. This is consistent with Sergeant Flaherty's testimony at the hearing on the motion to suppress that testing was performed sometime after 2:30 P.M., after the warrant had issued. The defendant has failed to show that the chemist's notes were exculpatory, or that he was prejudiced by late disclosure of the notes. We add that trial counsel made effective use of those notes at trial, and demonstrated that she had become thoroughly familiar with them. The defendant has failed to show any prejudice, and the motion judge did not err in denying the motion for a new trial on the grounds discussed herein.

6. *Prosecutor's closing argument.* The defendant argues that the prosecutor's closing argument was improper and prejudicial in three respects, thereby depriving him of his due process right to a fair trial. His first claim is that the prosecutor's argument that the scratches on his scalp were inflicted by the victim as she struggled for her life is not supported by the record. We disagree. The jury reasonably could infer that the scratches on

the defendant's scalp were due to his involvement in the killing. See *Commonwealth* v. *Deane*, 458 Mass. 43, 52 (2010). Thus, the prosecutor's statement that the wounds were inflicted by the victim was a fair argument. The inference suggested by the prosecutor was not necessary, nor must it have been. It was enough that the inference was reasonable and possible. See *Commonwealth* v. *Robertson*, 408 Mass. 747, 755 (1990).

The defendant's second assignment of error involves the prosecutor's invitation to the jury to share in something "we're all afraid of," see *Commonwealth* v. *Bizanowicz*, 459 Mass. 400, 420 (2011), which he described as being "mutilated" and stabbed "forty-two times" by someone that you love and trust. The defendant argues this improperly appealed to jurors' emotions. See *id.* There was no objection to this aspect of the argument. In his brief, the defendant aptly describes this argument as a "jumbled," clumsy response to trial counsel's rhetorical question in her closing: "What were they [the Commonwealth] afraid to know," referring to the Commonwealth's "rush to judgment" as a "breach of [the defendant's] trust that law enforcement officials would find the person who murdered his wife." The argument was obviously amateurish, and we fail to see how this argument "produc[ed] undue sympathy or bias. Furthermore, we assume that the jury have a reasonable measure of sophistication and are capable of sorting out hyperbole and speculation." *Commonwealth* v. *Marquetty*, 416 Mass. 445, 451 (1993). Finally, the reference to "mutilation" was not improper, given the number of stab wounds and the factors that must be considered on the charge of murder by extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

The third aspect of the prosecutor's closing argument involves a misuse of Hooper's "faint results" testimony. The prosecutor stated: "[I]f [the faint results contained] DNA from another person instead of a technical artifact, it's [the victim's DNA]." That argument was not fair and reasonable as a matter of law, as Hooper's testimony could not have been used to support a finding that the DNA belonged to the victim. See *Commonwealth* v. *Curnin*, 409 Mass. 218, 222 n.7 (1991) (where results of DNA test inconclusive, consequences of test inadmissible). The issue is preserved and our review is under the prejudicial error standard.

See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983) ("An error is nonprejudicial only '[i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect . . .' "). However, we do not think the argument requires reversal.

The case against the defendant overwhelmingly established from two independent sources of expert forensic evidence, fingerprint identification, and DNA analysis that the defendant killed his wife, then bound himself with duct tape in an attempt to conceal what he had done. Her blood was on his clothing, and his fingerprints were on the adhesive side of the duct tape used to bind him. The portion of the prosecutor's closing that was based on Hooper's "faint results" testimony was secondary to the very powerful proper DNA evidence and fingerprint evidence, and added nothing with comparable heft. It was an afterthought in the structure of the closing, and it was not presented as if it were Hooper's opinion. The prosecutor acknowledged that the evidence was problematic, and that it might not be DNA, but a technical artifact.

Trial counsel registered an immediate objection, but when she explained her objection at sidebar after closing argument, she stated that it was not supported by the evidence, "particularly [the argument] concerning blood on the left faucet, the hot water." Her explanation focused on something inconsequential, and something other than the "faint results" matter. This suggests that the "faint results" portion of the closing argument was even less harmful than the reference to the hot water faucet, and did not strike a foul blow. Compare and contrast *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 n.8 (1987) (absence of objection by defense counsel may provide some guidance whether particular argument was prejudicial in circumstances). We are satisfied that the prosecutor's argument likely did not influence the jury's verdict.

7. *Ineffective assistance of counsel.* The defendant asserts that counsel was ineffective for (a) failing to move to suppress photographs taken of the defendant's scalp wounds and evidence of blood tests of his hands obtained without a warrant while he was in a hospital emergency room; (b) failing to move to suppress

photographs and a videotape recording of the defendant's residence taken without a warrant; and (c) failing to present medical evidence of amnesia that would have corroborated the defendant's various accounts to police.

a. *Evidence taken from the defendant's person.* In order to show that counsel was ineffective for failing to file a motion to suppress evidence, the defendant must show such a motion likely would have succeeded. See *Commonwealth* v. *Cutts*, 444 Mass. 821, 830 (2005). The defendant relies on alleged conflicts between accounts as to when photographs of his scalp wounds were taken, i.e., before or after a search warrant issued for his person. The testimony of State Trooper Steven McDonald lies at the heart of this issue. The judge who heard the motion for a new trial was asked to consider this issue as a suppression issue only, and concluded that the photographs offered in evidence were taken after the search warrant issued, and pursuant to the warrant. There was a basis in the record for this conclusion, particularly where there necessarily were no contradictions in McDonald's testimony. Contrary to the defendant's contention, McDonald did not testify before the grand jury that photographs were taken of the defendant in the hospital that morning. He testified only that photographs of the defendant's scalp wounds were taken. Moreover, he did not testify before the grand jury that he saw the scalp wounds in the morning. He said he saw them "[l]ater on in the day," which was consistent with his trial testimony about this sequence of events, and also consistent with his trial testimony that the photographs offered in evidence were taken after the search warrant had issued, which was shortly before 2:30 P.M. Because there was no likelihood the defendant would succeed on a motion to suppress, counsel was not ineffective, and there was no error or abuse of discretion in the denial of his motion for a new trial.

A similar analysis applies to the occult blood testing done on the defendant's hands pursuant to the search warrant for his person. The chemist who did the testing could not recall precisely when he performed the test, but testified he performed them after the warrant for the defendant's person had issued, and the test was performed pursuant to the warrant.

b. *Photographs and videotape recording of the defendant's*

*residence.* The defendant contends police took photographs and a videotape recording of the interior of his residence without a warrant. Some of the photographs and the videotape recording were made soon after police arrived at the defendant's residence and before the medical examiner arrived. They documented the officers's first observations of the crime scene, as well as the appearance, condition, and position of the victim's body before it was disturbed or moved, conformably with G. L. c. 38, § 4. Although there is no "murder scene exception" to the warrant requirement of the Fourth Amendment to the United States Constitution, see *Mincey* v. *Arizona,* 437 U.S. 385, 395 (1978), police had been called to an emergency and that emergency had not subsided. The victim had not been declared dead by the medical examiner, and police were entitled to remain on the premises until the victim's body was removed and to seize any evidence in plain view until the emergency had terminated. *Id.* at 392-393. The police conducted no other search activity until a search warrant for the residence was obtained. The conduct of the police in these circumstances was circumspect, limited, and otherwise reasonable within the meaning of the Fourth Amendment. The judge who heard the defendant's motion for a new trial was asked to consider this issue as a suppression issue only and concluded that the photographs and the videotape recording thus were constitutionally permissible memorializations of what the officers properly saw in plain view. We agree.

Even if the photographs and the videotape recording were obtained in violation of the Fourth Amendment, they merely were cumulative of what the officers described they observed in plain view while properly on the premises responding to an emergency. Moreover, the defendant did not contend that his wife had not been murdered, and he has made no argument explaining how the photographs and videotape recording created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992).

c. *Medical evidence.* The defendant faults counsel for failing to present both at a pretrial suppression hearing and at trial medical evidence of amnesia that would have corroborated his account to police that he actually had been injured and was not feigning a loss of memory. This issue was raised in the defend-

ant's motion for a new trial and addressed thoroughly by the motion judge. Trial counsel presented evidence to the jury, largely through the Commonwealth's witnesses, including evidence indicating that the defendant indeed suffered a head injury; hospital records indicating he was in a semiconscious state and was experiencing memory problems; records of his medical history for treatment of seizures; evidence that an anti-seizure pill was found in his pocket; and evidence that failure to take medication, or a blow to the head, could trigger a seizure. Trial counsel also argued the point to the jury with force.

The motion judge noted that the defendant presented no expert opinion that the defendant did in fact suffer a seizure. The closest he came was an affidavit of a physician who treated him in the emergency room based on a differential diagnosis of severe closed head injury, but the doctor essentially ruled that out.

Trial counsel's affidavit indicates that she decided not to call medical personnel who treated the defendant because she perceived that they were hostile toward him, and where the medical records supported the defense without elements of hostility, the medical records alone would suffice. This was a perfectly reasonably strategic decision that defeats a claim of ineffective assistance of counsel. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). Moreover, as the motion judge noted, the evidence the defendant claims should have been offered by trial counsel merely was cumulative of evidence that was offered, and the failure to offer cumulative evidence does not rise to the level of ineffective assistance. See *Commonwealth* v. *Drew*, 447 Mass. 635, 650 (2006).

The motion judge also addressed the defendant's claim that a psychologist who evaluated him on the question of competency to stand trial would have supported his contention that his amnesia was real, and that this witness should have been called to testify. After reviewing the psychologist's report, the judge concluded that rather than providing support for the defendant's claim, the report expressed skepticism of it. The defendant reported no prior prolonged state of altered consciousness in his past, and the psychologist suggested in his report that even if the defendant suffered temporary amnesia, it could have been induced by a self-inflicted injury. The motion judge also noted that trial

counsel's affidavit indicated she did not call the psychologist to testify for strategic reasons. The judge concluded that her decision not to call the psychologist was reasonable. We agree. Counsel, therefore, was not ineffective. See *Commonwealth* v. *Adams, supra.*

8. *Evidentiary hearing.* The defendant asserts that the judge abused her discretion by denying his request for an evidentiary hearing on his motion for a new trial.

"A judge may, in . . . her discretion, decide a motion for a new trial without an evidentiary hearing where no substantial issue is raised by the motion or affidavits." *Commonwealth* v. *Wallis,* 440 Mass. 589, 596 (2003); Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). To determine whether a substantial issue has been raised a judge considers not only the seriousness of the issues raised, but also the adequacy of the defendant's showing on those issues. See *Commonwealth* v. *DeVincent,* 421 Mass. 64, 67 (1995). A judge is not required to credit assertions in affidavits submitted in support of a motion for a new trial, but may evaluate such affidavits in light of factors pertinent to credibility, including bias, self-interest, and delay. See *Commonwealth* v. *Grant,* 426 Mass. 667, 673 (1998). The judge reviewed the defendant's supporting affidavits and concluded that even if the factors asserted therein were true, he would not be entitled to relief. We agree, and conclude that the defendant has not shown that the judge abused her discretion in denying him an evidentiary hearing.

9. *G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the entire record, and decline to reduce the degree of guilt or order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

*Order denying supplemental motion for a new trial affirmed.*